Bank of Am., N.A. v ASD Gem Realty LLC (2022 NY Slip Op 01379)





Bank of Am., N.A. v ASD Gem Realty LLC


2022 NY Slip Op 01379


Decided on March 03, 2022


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 03, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Barbara R. Kapnick
Peter H. Moulton, Lizbeth González, Julio Rodriguez III, Bahaati E. Pitt


Index No. 850296/15 Appeal No. 14805-14806 Case No. 2020-04206 2020-04207 2020-04932 

[*1]Bank of Am., N.A., Plaintiff,
v
ASD Gem Realty LLC, et al., Defendants, Arenson Off. Furnishing Inc., Defendant-Respondent, Sweet Constr. Corp., Defendant-Appellant.
50 W. 47th St. Condominium, Third-Party Plaintiff,
v
Control Elect. Contr. Corp., & Silberstang Lasky Architects PC, Third-Party Defendant, Sweet Constr. Corp., Third-Party Defendant-Appellant. Arenson Off. Furnishings Inc., Plaintiff-Respondent,



Defendant appeals from the judgment of the Supreme Court, New York County (Jennifer G. Schecter, J.), entered December 15, 2020, against defendant/third-party defendant Sweet Construction Corp. and in favor of defendant/third-party plaintiff Arenson Office Furnishing Inc. in the amount of $181,115.93. Defendant also appeals from the original judgment, entered October 14, 2020 and from the order, same court and Justice, entered September 9, 2020, which granted Arenson's motions for leave to amend its complaint and for summary judgment, and denied Sweet's cross motion for summary judgment.




Ruskin Moscou Faltischek, P.C., Uniondale (Adam L. Browser and David Milner of counsel), for appellant.
Clark Guldin, Attorney at Law, Montclair (Janesa Urbano of counsel), for respondent.



MOULTON, J. 


Defendant appeals from the judgment of the Supreme Court, New York County (Jennifer G. Schecter, J.), entered December 15, 2020, against defendant/third-party defendant Sweet Construction Corp. and in favor of defendant/third-party plaintiff Arenson Office Furnishing Inc. in the amount of $181,115.93. Defendant also appeals from the original judgment, entered October 14, 2020 and from the order, same court and Justice, entered September 9, 2020, which granted Arenson's motions for leave to amend its complaint and for summary judgment, and denied Sweet's cross motion for summary judgment.
Ruskin Moscou Faltischek, P.C., Uniondale (Adam L. Browser and David Milner of counsel), for appellant.
Clark Guldin, Attorney at Law, Montclair (Janesa Urbano of counsel), for respondent.
MOULTON, J.
This action arises from the renovation of a commercial space in Manhattan's Diamond District. Defendants ASD Gem Realty LLC, and its operating affiliate ASD Diamond Inc. (together ASD) owned property at 50 West 47th Street, which it sought to operate as a jewelry store. In 2012 ASD hired defendant/third-party defendant Sweet Construction Corp. (Sweet) to perform construction and renovation work at the premises. ASD solicited proposals for the supply and installation of partitions in the space and ultimately selected defendant/third-party plaintiff Arenson Office Furnishings, Inc. (Arenson). Arenson subsequently entered into a subcontract with Sweet to "[p]rovide all labor, materials, tools, equipment, and scaffolding necessary to complete the Glass work."
ASD is not a party to the subcontract.
The subcontract contains two signature lines, one for "Sweet Construction Approval" and one for "Arenson Office Furnishings Approval." The subcontract provides that "[a]ll work to be performed pursuant to the ATTACHED SCOPE LETTER . . . and 'SCC General Requirements.'" The scope letter, which is on Sweet's letterhead, contains the following clause:
"Subcontractor understands that Contractor is acting as an agent for the Owner, and agrees to look only to funds actually received by the Contractor (from the Owner) as payment for the work performed under this Subcontract."
Between January and April 2014, Arenson furnished and installed metal and glass partitions in accordance with the subcontract. On April 16, 2014 and on December 17, 2014, Arenson and Sweet agreed to change orders for additional work which Arenson completed. The total amount owed for the work was $108,570.38. Neither Sweet nor ASD objected to Arenson's work.
On January 14, 2015, Sweet sent out an email notifying all subcontractors "of the payment process" for the project noting that "all subs are being paid directly from the bank, but will be distributed by [Sweet]." Each month, the subcontractors were required to submit payment requisitions to Sweet. Sweet would then submit the requisitions to the bank on the 15th of each month. Arenson was required to send in an executed conditional waiver form [*2]with each payment requisition.[FN1]
On January 14, 2015 and February 24, 2015, Arenson made applications for payment addressed to ASD, via the architect, for $85,873.50 and $97,713.00, respectively, and attached the conditional waiver form.
Arenson did not receive payment from either ASD or Sweet. Apparently, ASD ran into financial difficulties that are unexplained in the record before the court.
Arenson filed a mechanic's lien against the property in the amount of $108,570.38 in March 2015. In April 2015, it commenced a lien foreclosure action against ASD and the construction lender Bank of America (BOA) under index number 651170/2015. In October 2015, BOA commenced its own commercial foreclosure action against ASD and Arenson, among others, under index number 850296/2015. The two actions were consolidated by order dated March 10, 2016 under index number 850296/2015.
In January 2016, Sweet filed a mechanic's lien against the property in the amount of $576,472. Ultimately BOA obtained a judgment of foreclosure and conducted a foreclosure sale of the property on December 12, 2018. After BOA was paid, there was no surplus available to pay either Sweet or Arenson. Sweet suffered a loss of $576,472.00. Arenson suffered a loss of $108,570.38.
In 2020 Arenson moved for leave to file a second amended complaint to assert a claim against Sweet for violation of the Prompt Payment Act (the PPA).[FN2] Arenson also separately moved for summary judgment based on breach of contract and violation of the PPA. In support of both motions, Arenson submitted, inter alia, the affidavit of its Chief Financial Officer Arnold Manche. Manche averred that Arenson entered into the subcontract and two change orders with Sweet and completed the work without objection by either Sweet or ASD. Manche also stated that Arenson delivered the necessary requisitions to Sweet, but Sweet failed to pay Arenson for the stated reason that Sweet had not been paid by ASD. Manche asserted that Arenson was entitled to $108,570.38 as payment for the work.
Sweet cross-moved for summary judgment to dismiss Arenson's claims against it. In support of its cross motion, Sweet submitted, inter alia, the affidavit of its President Steven R. Alessio. Alessio averred that Sweet was unfamiliar with Arenson but complied with "ASD's directive" to hire Arenson. He stated that ASD told Sweet that ASD would be responsible for paying Arenson but that Sweet would facilitate the payment process with the construction lender, BOA. Citing the subcontract's payment language, Alessio claimed that Arenson could only expect payment from ASD, not from Sweet. While Alessio avers that ASD owes Sweet $576,472.00, his affidavit is silent on whether ASD ever made any payments to Sweet.
Supreme Court granted Arenson's motions and denied Sweet's cross motion by order entered September 9, 2020. Relying on West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co. (87 NY2d 148 [1995]) and its progeny, the court found that the subcontract language [*3]was an unenforceable pay-when-paid clause which improperly forced the subcontractor to assume the risk of the owner's nonpayment.[FN3] The court rejected Sweet's argument that it was ASD's agent and reasoned that the dispute presented a textbook example of a contractor seeking to avoid payment through an unenforceable pay-when-paid clause.
The court also rejected Sweet's argument that it was not liable to pay Arenson as ASD's agent in accordance with General Business Law § 756-a(3)(b)(i), which provides, in relevant part, that "where a contractor enters into a construction contract with a subcontractor as agent for a disclosed owner, the payment obligation shall flow directly from the disclosed owner as principal to the subcontractor and through the agent." Noting that Sweet failed to provide any legal authority for its interpretation of the statute, the court highlighted that General Business Law § 756-a(3)(b)(i) additionally provides that a subcontractor is entitled to payment "from the party with which it contracts" and that Sweet contracted with Arenson. The court further reasoned that an unpaid subcontractor may be entitled to multiple sources of payment. Although the PPA was enacted years after West-Fair, the court stressed that subsequent cases continued to hold that pay-when-paid clauses are void and against public policy.
Accordingly, the court directed the Clerk to enter judgment in favor of Arenson and against Sweet in the amount of $108,570.38, plus 9% statutory interest from April 7, 2015 through the judgment date, plus an additional 1% monthly interest under General Business Law § 756-b(1)(b) for late payment for the same period.[FN4]
Discussion
Agency
Generally, an agent who acts on behalf of a disclosed principal is not liable for a breach of contract (see Savoy Record Co. v Cardinal Export Corp., 15 NY2d 1, 4 [1964]). However, even an agent for a disclosed principal can be held personally liable for breach of contract if "there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal" (id.). The best indicator of that intent is the form of signature (id. at 6). Thus, where the agent signed two letter agreements "As Agent on Behalf of" a disclosed principal and the principal represented that the agent was "authorized to sign on [its] behalf" the agent was not liable for breach of contract (id. at 3; see also Tobron Off. Furniture Corp. v King World Prods., Inc., 161 AD2d 355, 356 [1st Dept 1990] [architectural design company was not responsible to pay for furniture delivered to its client because it disclosed to the seller that it was an agent for a disclosed principal and the agency was evidenced by the seller's invoices captioned "Intratec Group Ltd for: King World"]).
Supreme Court correctly found that Sweet was not an agent for a disclosed principal. The clearest indicator of Sweet's role, its signature, supports this conclusion. The signature [*4]line for "Sweet Construction Approval" and the signature do not indicate that Sweet signed the contract as agent on behalf of a disclosed principal or reflect any limitations (see TKS Realty, LLC v 391 Broadway LLC, 192 AD3d 572, 572-573 [1st Dept 2021] [individuals were liable for the company's breach of contract where the operating agreement provided that the individual defendants jointly and severally guaranteed the company's obligations and where the agreement was signed by the individuals without noting any limitations on their signatures]).
The terms of the subcontract also support the court's conclusion that Sweet was not acting as an agent for a disclosed owner. The language upon which Sweet relies to exculpate itself from payment obligation appears in the scope letter. In characterizing itself as "only a facilitator of payment" and "merely a conduit" Sweet ignores that the subcontract provides that the work is to be performed pursuant to the "SCC General Requirements." Those requirements, which also appear in the scope letter, provide that Arenson will, inter alia, indemnify and hold Sweet harmless with respect to Arenson's work; obtain liability insurance in Sweet's favor; and recognize Sweet's authority to issue safety violations and correct unsafe conditions. These general requirements, on their face, apply to Sweet in its own capacity, and not in its capacity as an agent.
Thus, as we did in Blandford Land Clearing Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa. (260 AD2d 86 [1st Dept 1999]), we reject Sweet's attempt to divide a single contract into one that creates an agency for purposes of payment but not for any other purpose. Like the contract here, the subcontract in Blandford contained language providing that the contractor was the agent of the owner for purposes of payment (id. at 88). We rejected the surety's argument that it had no obligations to pay the subcontractors because the contractor acted as the owner's agent. We reasoned that the "dual roles" of general contractor and agent are inconsistent, and that a contractor "cannot act as contractor for the purpose of directing plaintiffs' work under the subcontracts and as agent for payment for the purpose of compensating plaintiffs' efforts under those agreements without destroying the mutuality of obligation required to sustain a bilateral contract" (id. at 94-95). Thus, as we found in Blandford, Sweet's attempt to break out its payment obligation under the guise of agency while simultaneously retaining numerous other rights is "merely a thinly disguised pay-when-paid provision that the Court of Appeals held to be void as against public policy in West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co. (87 NY2d 148)" (id. at 89).
General Business Law § 756-a(3)(b)(i)
Sweet selectively invokes General Business Law § 756-a(3)(b)(i) in an effort to circumvent our precedent invalidating pay-when-paid clauses.
General Business Law § 756-a(3)(b)(i) provides:
"(i) Unless the [*5]provisions of this article provide otherwise, the contractor or subcontractor shall pay the subcontractor strictly in accordance with the terms of the construction contract. Performance by a subcontractor in accordance with the provisions of its contract shall entitle it to payment from the party with which it contracts. Notwithstanding this article, where a contractor enters into a construction contract with a subcontractor as agent for a disclosed owner, the payment obligation shall flow directly from the disclosed owner as principal to the subcontractor and through the agent."
This subsection cannot be understood without first understanding the PPA of which it is a part and the PPA's legislative history.
The New York legislature passed the PPA in 2002 to govern the timing of payments for construction contracts entered into after January 14, 2003, the effective date of the Act. The PPA provides that "[i]t is the policy and purpose of this article to expedite payment of all monies owed to those who perform contracting services pursuant to construction contracts" (General Business Law § 756-a). The PPA was amended in 2019 to, among other things, prohibit parties from contractually exempting themselves from the statute's payment provisions (see General Business Law § 757[4] ["[t]he following provisions of construction contracts shall be void and unenforceable . . . [a] provision, covenant, clause or understanding in collateral to or affecting a construction contract establishing payment provisions which differ from those established in subdivision three of section seven hundred fifty-six-a and section seven hundred fifty-six-b as applicable"]).
The payment framework for the PPA appears in General Business Law § 756-a, which is entitled "Obligations." The framework provides that payment is made by the owner within a specified time frame, which payment then flows through the pipeline within specified time frames. The PPA provides, among other things, that the owner or general contractor must approve or disapprove of all or a portion of an invoice within 12 business days of its receipt along with any contractually required documents (see General Business Law §§ 756-a[2][a][i]; 756-a[2][a][ii]). The owner must issue a written statement for any unapproved amounts based on enumerated statutory reasons (see General Business Law § 756-a[2][a][i]). The owner must make payment to the contractor within 30 days of an invoice's approval (see General Business Law § 756-a[3][a][ii]).[FN5]
Then, within seven days of receipt of payment from the owner, the PPA provides that "the contractor shall pay to the subcontractor, and each subcontractor shall in turn pay to its subcontractors, the full or proportionate amount of funds received from the owner for each subcontractor's work and materials" (see General Business Law § 756-a[3][b][ii]).[FN6] While the PPA does not prohibit the parties from contractually changing the time frame to review invoices, the parties cannot extend [*6]the time for payment beyond the PPA's 30-day and 7-day payment periods (see General Business Law § 757[4]).
General Business Law § 756-b, which is entitled "Remedies," provides for the statutory remedies of interest, suspension of performance, and arbitration in the event of noncompliance with the statute.
The PPA's legislative history also reflects the statute's intent to address the timing of payments for construction contracts. It provides in relevant part:
"It is the intent of this legislation to address those situations in which, contrary to existing contracts, payments for approved services are unjustly delayed. Unjustified delays in paying construction contractors and material suppliers may discourage such firms and organizations from doing business in this state."
(L 2002, ch 127, § 1).
The Sponsor's Memorandum further recognizes that the bill was enacted as a result of "a growing trend" where "payments for services are unjustly delayed by unscrupulous organizations in the construction chain" (Sponsor's Mem, reprinted in 2002 NY Legis Ann at 81-82). Thus, the bill "provides greater recourse to aggrieved contractors who do not have economic power to deal with bad actors in the construction chain" (id.).
Against this backdrop, we turn to Sweet's statutory argument.
According to Sweet, the intent of General Business Law § 756-a(3)(b)(i) is to provide an agent for a disclosed owner with a "safe harbor" that "exculpates" the agent from personal liability as the owner's agent. To support this misreading, Sweet points out that the third sentence of General Business Law § 756-a(3)(b)(i) begins with "[n]otwithstanding this article." Sweet maintains that this language signals that the legislature intended that the payment obligation in the second sentence (entitling the subcontractor to payment from "the party with which it contracts") does not apply when the contractor is acting as an agent for a disclosed owner.
Sweet's arguments are unavailing. First, the provision is inapplicable because Sweet is not ASD's agent for the reasons previously explained. Second, Sweet's interpretation is unsupported by any legal authority and is built on distorting the meaning of General Business Law § 756-a(3)(b)(i). Sweet seizes on the language "[n]otwithstanding this article" but fails to explain why the language refers to the entire "article." If the intent of the third sentence is to negate the subcontractor's entitlement to payment explicitly provided for in the preceding sentence, logic dictates that the third sentence would have referred directly to the second sentence as opposed to the entire "article."
More crucially, Sweet's interpretation overlooks the entire purpose of the PPA and turns the statute on its head. The PPA is concerned with only one thing: the timing of payments. It is not concerned with exculpating an agent or providing a safe harbor. It is also not intended to benefit a higher-tiered party at the expense of a lower-tiered party [*7]or "strike [ ] a balance between protecting contractors and subcontractors" as Sweet contends. Rather, the purpose of the PPA is to protect those lowest in the construction chain from those highest in the construction chain by mandating prompt payments (see Sponsor's Mem, reprinted in 2002 NY Legis Ann at 81-82).
The third sentence accomplishes this purpose by having the statutory payment obligation flow from the disclosed owner through the agent directly to the subcontractor. By passing the obligation through the agent, the subcontractor is imbued with the panoply of statutory benefits and remedies that ordinarily would have inured to the contractor had the contractor acted on its own behalf, instead of as the owner's agent. Consequently, the third sentence refers to the entire "article" because the subcontractor is entitled to all of the article's benefits and remedies that would have ordinarily flowed to the contractor.
Finally, contrary to Sweet's argument, the court did not improperly rely on West-Fair. The fact that West-Fair did not involve the issue of agency does not obviate that the Court of Appeals was concerned that a pay-when-paid provision "forces the subcontractor to assume the risk that the owner will fail to pay the general contractor" and therefore is "void and unenforceable as contrary to public policy set forth in the Lien Law § 34" (87 NY2d at 158). Sweet's argument that West-Fair is distinguishable because the Lien Law issue in that case is absent here is also unpersuasive. In Blandford, the surety similarly argued that the same Lien Law concern was absent because the subcontractor still retained the right to enforce a lien against the owner as the disclosed principal (260 AD2d at 90, 95).We disagreed and held that "the contractual arrangement violates public policy for the same reasons articulated in West-Fair" because "upon default, there is no indebtedness by the owner to the general contractor that would serve as the predicate for a mechanic's lien (under Lien Law § 4[1])" (id. at 95).
Accordingly, the corrected judgment of the Supreme Court, New York County (Jennifer G. Schecter, J.), entered December 15, 2020, against defendant/third-party defendant Sweet Construction Corp. and in favor of defendant/third-party plaintiff Arenson Office Furnishing Inc. in the amount of $181,115.93, should be affirmed, without costs. The appeals from the original judgment, entered October 14, 2020 and from the order, same Court and Justice, entered September 9, 2020, which granted Arenson's motions for leave to amend its complaint and for summary judgment, and denied Sweet's cross motion for summary judgment, should be dismissed, without costs, as subsumed in the appeal from the corrected judgment.
Judgment of the Supreme Court, New York County (Jennifer G. Schecter, J.), entered December 15, 2020, affirmed, without costs. Appeals from the judgment, entered October 14, 2020 and from the order, same court and Justice, entered September [*8]9, 2020, dismissed, without costs, as subsumed in the appeal from the corrected judgment.
Opinion by Moulton, J. All concur.
Kapnick, J.P., Moulton, González, Rodriguez, Pitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: March 3, 2022



Footnotes

Footnote 1:The condition waiver form provided in relevant part that upon bank clearance of a check from A.S. Diamonds, Inc. to Arenson in the amount of the requisition, the form would "become effective to release any mechanic's liens, stop notice or bond rights."

Footnote 2: The consolidated caption lists BOA as the plaintiff and ASD, Sweet and Arenson, among others, as the defendants. However, Arenson's pleading is denominated as a complaint because the caption also lists Arenson as plaintiff and BOA and Sweet as defendants.

Footnote 3:As explained in Welsbach Elec. Corp. v MasTec N. Am., Inc. (7 NY3d 624, 628 n2 [2006]), such payment clauses are sometimes interchangeably referred to as "pay-when-paid" or "pay-if-paid" clauses. The distinction is subtle. A pay-when-paid clause (i.e., when the contractor agrees to make payment to the subcontractor within a certain period after receipt of the owner's payment) is considered a timing mechanism (id.). A pay-if-paid clause (i.e., where payment by the contractor to the subcontractor is contingent on the owner first paying the contractor) is considered a condition precedent (id). However, a pay-when-paid clause can have the same improper effect as a pay-if-paid clause when payment is unduly delayed (see A.E. Rosen Elec. Co., Inc. v Plank, LLC, 63 Misc 3d 1207(A) [Sup Ct Albany County 2019], affd 181 AD3d 1080 [3d Dept 2020]). Because the parties and Supreme Court use the term pay-when-paid, we will continue to use that term in this decision.

Footnote 4:Arenson was awarded $235,125.59 pursuant to a judgment entered on October 14, 2020. The judgment incorrectly calculated the amount of interest. The parties stipulated to correct the error, and a new judgment was entered on December 15, 2020 for $181,115.93.

Footnote 5: If payment by the owner is contingent on lender approval, payment is generally due seven days after the owner's receipt of funds from the lender (see General Business Law § 756-a[3][a][iii]]).

Footnote 6: The PPA also contains procedures for a contractor's and subcontractor's approval or disapproval of an invoice (see General Business Law § 756-a[2][a][ii]).